May it please the court, my name is Molly Quinn and I represent the appellant James Dowdy. We're asking this court to reverse and remand for a new trial on both counts. Mr. Dowdy's convictions for second-degree murder in discharge of a firearm during a crime of violence were against the weight of the evidence. These convictions amount to a carriage of justice and the district court should have granted a new trial under Rule 33a. Despite the verdict in this case, the weight of the evidence shows that the witnesses misidentified Jimmy Dowdy, the defendant, as the shooter. There were three eyewitnesses to this shooting that night. They were all teenagers, they had all admittedly been drinking and or using drugs, specifically marijuana and cough syrup. This happened in the very early morning hours, it was dark outside, the sun wasn't up yet, and any possible identification of the shooter happened at a distance. Well, two or three things, counsel. I assume that the court gave our standard instruction, the model instruction, on eyewitness, right? Yes. Yes. No, I'm sorry, I'm going to clarify. The district court did give the standard instruction on witness credibility. There is a specific instruction on eyewitness identification that was not given. Okay, was it requested? It was not. Okay, thank you. So, first thing I wasn't clear about, thank you. And the second thing is, what about, though, the way you can interpret it to say that's true, at the time you're talking about they were further away, but shortly they'd been almost side-by-side? I'm sorry, I didn't quite... I'm sorry. You do it based on, is it 75 feet? I'm trying to remember. 75 yards, but... 75 yards, thank you, there's a difference, thank you. And the other side says there was a time earlier that they were almost side-by-side, that was my word. So, so, so respond to that, and isn't it for the jury either way? That's right, Your Honor. There are two possible identifications. The first one is the 75 yards between the shell casing, which is where the witnesses approximately placed the shooter, and where the victim was shot. And the other, the other distance isn't quite as clear. I would disagree with it being side-by-side. Okay. I know there was a lot of references to maps and stuff in the trial, and my understanding is it was just a blank map that ended up going to the jury and being introduced in evidence, so it is a bit difficult to try to parse out where exactly people were. And my understanding, my reading of the record, is that we don't know exactly where the witnesses were in relationship to each other, and therefore what the distance was when... What could the jury assume favorable to verdict? If this were a sufficiency standard, we would take all the evidence in the light most favorable to the government and assume the closest possible distance, which again I don't believe that I have a number from that I could parse from the record, but this is the motion for a new trial based on the weight of the evidence context where the district court and this court are allowed to kind of reweigh the credibility of the witnesses and the evidence. What's the last time we've reversed him on a reweighing basis? I'm not aware of a case, Your Honor. But to get back to the question... I mean, your, your, your brief almost, as I read it, almost concedes that you're making a sufficient sufficiency argument under the guise of the supposedly more favorable new trial standard, but the problem is we never, we, we, we don't, we don't second-guess our district judges on the new trial standard. I agree this is a deferential abuse of discretion standard of review. I disagree that we're making a sufficiency... Well, it's a deferential review of the jury verdict primarily, but also the yes, at this posture, this court is reviewing the district court's decision to defer to the jury's determination for abuse of discretion. But I do disagree that we're arguing a sufficiency... the evidence on a sufficiency under Rule 29 standard, the evidence is sufficient. These, these young eyewitnesses said it was Jimmy Doughty. Jimmy Doughty shot our friend. That's enough for the Rule 29, but I think this is a unique case under the unique circumstances of this case that was an unfortunate misidentification. And I do want to get back to that question about how close was this identification. There is, I, you know, I have to... Doesn't RO's testimony, we keep talking about how dark it was and how far away they were. RO says I know him. He's my family. I could tell by, from his walk who it was. She did, and they did say it's... Doesn't that kind of slam the door on you? No, and here's why. You know, all these witnesses do say we knew Mr. Doughty, we knew Jimmy Doughty from walking around town, and RO, I agree, she has the strongest claim for knowing him. She says... And she said to the dispatcher overheard her say to the Good Samaritan, it's Jimmy, it was Jimmy Doughty, right? That's correct. They did say it was Jimmy Doughty very early on in the case, I do agree. She did, yes, it is her voice. And so RO does have the strongest claim to knowing Jimmy Doughty. She says, yes, I'm related to him. I see him around all the time, but she didn't know him well. She said she'd never spoken to him. This is, you know, family I think might have kind of a broad sense in this community that people can be distantly related and not know each other well, and that's true for all of these witnesses and Mr. Doughty. In RO specifically, the young woman couldn't identify Mr. Doughty at trial. She was given the chance to point him out in the courtroom a couple times and couldn't do it. I know there were some witnesses who said he looks way different now. Officer Puckett, who's one of the tribal officers who also was familiar with Mr. Doughty, said no, he looks exactly the same. So RO who says, he's my family member, I know him so well I could tell him from his walk. She couldn't identify him in the courtroom. She had to identify him based on a Facebook picture. That is exhibit 69A, and if the court looks at that, it actually has Jimmy Doughty the name printed on there three times. It's twice at the top, kind of in the information about where this came from from the internet, and then right below the photo there's a, it says Jimmy Doughty right there, the name of the person from the Facebook page. Was that, was that exhibit contested? It was, the specific point that I'm talking about where his name appears on there, I don't think that that specific part was contested. The government did attempt to introduce an array of Facebook photos to see which one she would pick. The district court limited it down to this one that was then introduced as exhibit 69A, but I don't recall a specific objection to his name appearing. No, no discussion of taking the name? That's right, and you can see there is a photo that's redacted by, like, with a Sharpie. There's one photo kind of in the corner of the exhibit that's redacted out, but the names were not. But was there a, is there a brother? There, there is, Your Honor. There is a brother, his name is Jojo Doughty, and this witness, RO, who we're talking about did admit, at least on cross, about a week and a half after the shooting when she was talking to the FBI, she said, yeah, you know, maybe it could have been Jojo. And so, you know, I have to admit, there is a discussion. She, RO, testified that before, at some point when they first saw who they say was the shooter, she and her friend who died talked about, hey, is that Jojo or is that Jimmy? And they kind of thought, they did think that it was Jimmy, but then later on she says, well, maybe it could have been Jojo. And I would, there is an exhibit, exhibit 4, that shows the arrest of it, or the arrest of our client in this case, and it does show Jojo, the brother at the beginning, and Jimmy appears later on. So the jury was able to see Jojo and Jimmy, and this court could look at him as well. And although these witnesses, by the time of trial, have converged on, the shooter was Jimmy Doughty, and I can give a really good description of Jimmy Doughty, at various points they also said, the shooter looked like a little kid. RO, the young one we've been talking about, said on the scene, I thought it was a younger kid. Donovan Youngman, who's the oldest of the group, a 19-year-old young man, he said the shooter looked like a little kid when he was walking. He said that in an interview a couple months later with the FBI. And like I said, we have, at trial, we definitely have a consistent description of Jimmy Doughty, but on the scene, the witnesses are initially giving different descriptions, somewhat from each other, and also from what they say at trial. Two of them on the scene said the shooter was wearing a white undershirt, or a white beater, a sleeveless undershirt, and the other said, no, he was wearing a sweater with a hood. Another one, the young woman, RO, we've been talking about, said the shooter had blonde hair, but was wearing a white beater. At the time of trial, they all described him as wearing... Two of them saw a backpack, didn't they? I'm sorry? At least two of the witnesses saw the same backpack. Yeah. Described a similar backpack. At least at trial, they did, yes. And I'm looking back at my notes from the initial descriptions on the scene, I believe it was just RO, the young woman, from my notes of the record, that identified the backpack initially. And I do know that ARC, the 17, yes, the 17-year-old young man, it's explicit on the record that the first time that he was talking about... Oh, I'm sorry, I'm confusing that with the hoodie. The government's brief said all three saw a hoodie and red shoes. Right, and that is at the time of trial. And I'm trying to make a distinction between what they say on the scene... Weren't red shoes found in the search? Yes, they were. Red shoes were found, black backpacks. You can see dark hoodies in the pictures, they weren't seized as evidence. But the white undershirt or the white beater that they described isn't seized as evidence, that's missing. And light-colored shorts that they describe him at various points aren't seized as well. And so we have witnesses who... How do we evaluate the fact that there's some objective evidence corroborating the eyewitnesses you're attacking under Rule 33? Well, I think I want to make a distinction between... Is that pretty significant? There are some items of clothing that are found that do corroborate at least the description that they're giving at trial. But our position is that that was a misidentification, and they are describing Jimmy Doughty at trial. But the problem is that the weight of the evidence is that even though they convinced themselves early on that Jimmy Doughty was the shooter, everything converged around that theory very early on. And therefore, this identification was a misidentification, and it was against the weight of the evidence. I want to move on to the issue of the witness meeting. The district court abuses discretion allowing these three young eyewitnesses to meet together before trial. Is this plain error review? I want to start by clarifying there are two issues, two errors that were made in relation to this meeting. One is plain error review. That is what was said at the meeting. That didn't come out until after trial in the defense investigator's affidavit. But there was an objection to allowing this meeting in the first place. And that was an abuse of discretion at the time, prejudicial error, even if you set aside what we know from the affidavit. Plain error given the limitations that the district court put on the meeting and the fact that the court directed that a defense expert as well as a court security officer be present? That's plain error? I disagree. And to ensure that they didn't talk about the case? I disagree that this court reviews for plain error for the decision to allow the meeting in the first place. How can it be error? Where's the abuse of discretion when you put that kind of constraints and direct the presence of monitors? If they had abided by the district court's limitations on the meeting, this wouldn't be an issue, right? It would, and I'll tell you why. It was an abuse of discretion in the moment because if you really look at what the government said in requesting this meeting, it's clear that it wasn't just about emotional support for a struggling young man, but it went directly to issues of witness bias and witness credibility. But wasn't the meeting actually stopped the minute that it looked like it was getting at that point? It was, Your Honor. So there's no prejudice, right? There would be prejudice. I think if we're shifting to the moment of the meeting itself and what was said during the meeting, the statement, the FBI, those agents are trying to blame me, that ARC, the young man, said. And that's when they stopped? They stop it at that point. And then once that's said, that goes directly to witness bias and credibility, that these other teenagers, they now know. If we waver at all on whether this is Jimmy Doughty, it's not just some person we don't know. Well, Your Honor, the statement's a little bit ambiguous. The statement's a little bit ambiguous, too. Isn't it, counsel? The statement the FBI agents are trying to blame this on me? No, the statement by the first person who spoke. I'm sorry, I don't know the name. And when they say, no, we've got to stop this. The first statement was, the FBI agents are trying to blame me. That was ARC, the 17-year-old. The second statement is, don't worry, we got this, bro. Yeah. And don't worry, we got this. I think on the street that means a lot of different things. It could mean a lot of different things. I think the first statement that we do know is more clear and more concerning  it's not just some person we don't know. One of the things that came out before the meeting was stopped, right? That's right. So it didn't last very long. I don't know how long it lasted. It can't have lasted very long, right? I don't believe so, but I don't believe that I have a time limit or a time set out on the record. How could it be putting – it seems like the decision to allow this meeting initially is where your abuse of discretion argument lies, right? So at that point, as I understood the district court, it was saying, well, we let witnesses sit out in the hall and talk amongst each other, just tell them not to talk about the case. And my impression was he was saying, well, this is really no different, and they're just not able to do it because of their situation. So can we – how is that, at that moment, how is that an abuse of discretion? I'll point to two things. I'm pointing to the trial transcript at page 39. The government says it's telling the district court that this young man can't give a statement at all to anybody without talking to his friends first. They say, we can tell you that in prior statements he has given, they weren't present, the friends. You're going too fast. What are you referring to? I'm referring to when the – Something in the record or something? Yes, something in the record at trial transcript page 39, when the government is making the request. They say, paraphrasing the beginning, that when ARC, the young man is meeting with investigators in the FBI, he asked to have his friends present. They had to be with him beforehand to give him some kind of rapport. So we know at the time the request happens that this young man can't make a statement without talking to his friends first. No, we don't know that. That's what the government – Well, we're talking about attempting to have the best environment for witnesses in an always nervous situation. But the government – You're saying with the help of hindsight, putting the absolute worst spin on everything that was said by everybody. I don't believe I am in this instance, Your Honor. This is what the government said about previous meetings, that this young man, every time they try to talk to him, has to talk to his friends first. Was the district court wrong saying that in this district or in my courtroom this is not unusual to allow sequestered witnesses to be together so long as they didn't talk about the case? Was that a false statement? It was not, and my time is up, but can I briefly elaborate? I mean, these people, they were sequestered beyond the normal sequestration, and so there was permission from the court needed to put them in the normal situation of sequestered witnesses, right? Yes or no? Yes, and I would point to the first pretrial conference on page 45 and 46. There is a specific concern brought up about these three teenage eyewitnesses and the lack of boundaries and the concern that they've been talking to each other about the case. This is something the defense raised. All that pours forward to the trial situation, and poof, we have an abuse of discretion. I guess you want us to be three trial judges there on that day. I don't see anything unreasonable in the court's decision to help comfort or improve the attitude and emotional stability of soon-to-be trial witnesses in a murder case. Okay. Thank you. Thank you. Thank you, Your Honors. May it please the court and Ms. Quinn. This is an unusual eyewitness testimony case because it's not the typical case that this court has generally seen in most courts where a stranger commits a crime and later there's a police lineup and they pick someone out of the lineup and say, I think that's the guy. That's not this case at all. This is a case where three witnesses, the three survivors of the encounter with Jimmy Doughty, knew him. Ironically, really the murder victim appears to be the only one who didn't, and we know this because of the conversation they had when they first saw him between the two girls who were there. And the one who was his cousin or relative of some sort said, or actually the murder victim first said, is that the person we drank with that one time who was JoJo, the brother? And RO, the surviving girl, said, no, no, no, that's Jimmy Doughty. He's my cousin. I don't know if you recognize him. How close were they at that time, does the record say? The record does not say an exact, but we have estimations. We know it was much closer than the 75 yards that the shell casing was found between the shell casing and the blood spot. But the way this was is there's a Highway 18, runs right through the town of Pine Ridge, and there's the COP building or CAP office, and there's a parking lot here. So there's a street that they're coming up, and they're cutting across the corner of the gravel parking lot. At the same time, Jimmy Doughty is on the other side of the street. And so there's a point where they're intersecting like this. I would not say they were side by side, but they were much closer than as he continued walking and walking. And then he turns around at first with the gun to point it. They see him again there. Then he turns around again and fires the shot that killed the victim. Did any witness estimate the distance? No, Jeff said it was much closer than just by looking at maps. No, we did not have an estimation in yards. Was there any other testimony about where Jimmy Doughty or JoJo Doughty was that night, either before this event or after, to place him close or not place him close? Only from Jimmy Doughty. Jimmy Doughty, in statements made prior to trial, said, I hadn't left the house in four or five days, so it couldn't have been me. Were those admitted at trial? Yes, that was admitted at trial. So the case was entirely just a slice of time case and no evidence of the location of him or anyone else before or after, except that he was found at his home? Found at his home, which was about four or five blocks away, and then the corroborating evidence of what the witnesses saw him wearing, the red shoes, the backpack, black hat. At the time? At the time, that's right. The gun was never located. There's also evidence in the record that he lied to the police about having black jean shorts to the FBI agent. Actually, he said, no, I don't have those. Well, then they found them in his room. So that's kind of the universe of evidence, though, that we're dealing with in this case. It was 3 a.m. and there was no one who was keeping track of where Jimmy Doughty was. He didn't have an alibi other than his own testimony. How quickly did law enforcement get to the house to talk with Doughty? Several hours had passed, I think two hours at least. I think it was about 6 a.m. when the first contact, when someone first went to his house, they didn't get a search warrant until early afternoon, I believe. So several hours had passed. So no gun residue evidence, nothing like that? No. Was it sought? No. No gun residue testing was done. What we have here were the three witnesses immediately say, this is Jimmy Doughty before anything even happens. There's a discussion that it's Jimmy Doughty. And the other two, the men or the boys who were there, also said immediately that that was Jimmy Doughty and they knew it. They testified to a certainty. This is him. This is certainly him. We see him. We know him. They don't speak with him, but he's a known character, a known quantity around the small town of Pine Ridge. Did R.O. say with certainty? Because that was kind of an unusual circumstance. She couldn't identify him in the courtroom. Right. Did she then follow up and say, but I'm certain? She said, I am certain it was Jimmy Doughty. And they said, well, where's Jimmy Doughty here? And she couldn't pick him out in the courtroom at the time. I think she's 16 years old. He looked much different. There was testimony in the record from several of the witnesses, the officers, that he looked much different at trial than he looked on that night. He had shaved his beard, his chin beard. He was wearing glasses. He didn't have the ball cap on. He wasn't dressed. He was in a dress shirt. So she couldn't pick him out of the crowd. She was only one of the three that couldn't say who he was at trial. But in looking at his Facebook photo and other witnesses and looking at his booking photo, said, yeah, that's certainly him. And there was no doubt whether it was Jimmy Doughty. It was just who was there that night. It was just the one witness couldn't immediately say who he was in the courtroom. And the jury heard all that, and that's been argued infinitum to the jury and to Judge Viken. I will say in the standard, I think there was a suggestion in the brief that Judge Viken didn't apply the proper standard to a new trial motion. And he says on page 11, he recites the proper standard, the same one recited in the defendant's brief. But he says on page 11 of his order, in making its determination on the new trial motion, the court weighed the evidence and assessed the credibility of the witnesses. And in doing so, his conclusion was this was no miscarriage of justice. So Judge Viken has made a credibility assessment of these three eyewitnesses' testimony, their immediate identification of Jimmy Doughty, and he affirmed. And I think it would be unusual for this court to overrule Judge Viken, who heard all the evidence and made a credibility determination and make its own credibility determination. I'm not aware of a case where something like that's happened. Really, when you listen to the – it's so fortunate we have the dispatch call. I mean, that is just perfect direct evidence. They immediately flag down a car, and this woman, Trina, calls 911, and she's talking to dispatch. And dispatch says, do they know who shot her? And Trina says, do you know who shot her? And R.O. screams, Jimmy Doughty. I mean, it's chilling to hear. And the victim, T.C., is still lying on the ground moaning, bleeding to death at that time. And then Trina says, Jimmy Doughty shot her. So we know who this is immediately. And the police were on the scene in about 20 minutes and talked to all three witnesses and all three immediately. So, yeah, it was Jimmy Doughty. There was just no doubt. I mean, they knew him. They know who this is. On the jury instruction issue, the plain error question, it's true it was not requested. I mean, sometimes strategic decisions are made in these cases by defense counsel. They did not request the eyewitness instruction. And most of this court's cases hinge on the fact that you probably ought to give it if it's requested. But it's certainly not plain error. There's no case that says you must give it when it's not requested. And so I would suggest that issue doesn't have teeth. And the jury was instructed on witness credibility, including whether or not a witness is affected by drugs or alcohol, their opportunity to observe all the conditions. That was given in the general credibility instruction. So I would suggest that that's not plain error in this case. On the issue regarding the meeting, it's very true what Judge Viken said. I mean, usually witnesses are free to talk to each other, not about the case in the courtroom or while the trial is going on, but all the time witnesses are sitting out in the hallway with each other. This ARC we're talking about was a homeless kid. He had no parents, no family structure at all, and he's in custody. And he wanted just to see his two friends. Really, his only support structure in the world before trial, and we wanted to accommodate that, and Judge Viken did. There was an objection to that by the defense counsel, but Judge Viken – and he narrowed what we wanted. He said this will be a ten-minute meeting, and it will be monitored by defense counsel's expert, by the marshals. We had our victim witness specialist there. Everyone was made clear you cannot talk about the case. ARC said something about the case, and they broke it up right away. Now, what he said was – it's speculating. There's not evidence in the record other than what he said, but what he said was these two FBI agents are trying to blame me. What I take from that, ARC was the guy who threw the rocks at Jimmy Dowdy, two rocks at him, which likely is what provoked Jimmy Dowdy to turn around and fire the shot. So I'm just speculating on that, but that's a simple explanation as to what he meant when he said that. And you could not show prejudice from that. I mean, it would overturn an entire trial. How did that affect the testimony? Everyone was already locked in on the night of the evening that Jimmy Dowdy shot this. Minutes after it happened, everyone knew it was Jimmy. I don't see how there could have been any prejudice arising from that issue. So if the Court has no further questions, I'll take my seat. But I would ask that you affirm this trial. This was a well-presented defense. Jimmy Dowdy had very good attorneys. The jury unanimously believed these witnesses. Judge Viken, in his own assessment, believed these witnesses. Jimmy Dowdy killed this girl, and his conviction should be affirmed. Thank you. Is there a rebuttal time? I think it's been very well briefed and effectively argued this morning. We'll take it under advisement. Thank you, Counsel.